# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

**BRINA BENNETT**, individually and on behalf of
all others similarly situated,
℅ DannLaw
15000 Madison Avenue
Lakewood, OH 44107

     Plaintiffs

     v.

**TOM VILSACK**, in his official capacity as
Secretary of the United States Department of
Agriculture (USDA),
United States Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

AND

**CINDY LONG,** in her official capacity of the
Administrator of the USDA Food and Nutrition
Service
Food & Nutrition Service
Braddock Metro Center II
1320 Braddock Place
Alexandria, VA 22314

AND

**STATE OF OHIO**
c/o The Attorney General of Ohio
30 East Broad Street
Columbus, OH 43214

AND

**MATT DAMSCHRODER**, in his official
capacity as Director of Ohio Jobs and Family
Services

     Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Brina Bennett ("Bennett"), individually and on behalf of all others similarly situated, through their counsel, brings this actions against Defendants Tom Vilsack, in his official capacity as Secretary of the United States Department of Agriculture ("Secretary"), Cindy Long, in her official capacity as the Administrator of the USDA Food and Nutrition Service ("Administrator"), the State of Ohio and Matt Damschroder in his official capacity as the Director of the Ohio Department of Jobs and Family Services (altogether, the "Defendants"), and allege upon personal knowledge as to their own actions and experiences, and upon information and behalf as to all other matters as follows:

## INTRODUCTION

1.      Plaintiff and members of the putative class are recipients of benefits through the Supplemental Nutritional Assistance Program ("SNAP") program and victims of an electronic form of theft of their SNAP benefits known as "skimming."

2.      The U.S. Congress authorized SNAP pursuant to 7 U.S.C. §2011, *et seq.* and the regulations which govern the administration of SNAP benefits set forth in 7 C.F.R. Part 271.

3.      The explicitly stated purpose of the SNAP program is to "to alleviate…hunger and malnutrition" and to "promote the distribution in a beneficial manner of the Nation's agricultural abundance." See 7 U.S.C. §2011.

4.      7 C.F.R. Part 271 further states that "[t]o alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation."

5.      As of July 2023, there are approximately 1.3 million individuals (or 11% of all Ohioans) who receive SNAP Benefits in Ohio as of July 2023.[1]

6.      In Ohio, the Department of Jobs and Family Services ("ODJFS") is the State agency responsible for administering the program for eligible Ohioans and ensuring that eligible SNAP beneficiaries receive their benefits.

7.      Defendant State of Ohio is responsible for ensuring that ODJFS delivers SNAP benefits to eligible participants.

8.      Defendant Damschroder is appointed by the Governor of the State of Ohio and, *inter alia*, directs the operations of ODJFS.

9.      Before receiving SNAP benefits, persons such as Plaintiff, must apply to ODJFS for the benefits and meet certain eligibility requirements which include an evaluation of income levels relative to household members.

10.     Once an applicant meets the eligibility requirements (e.g. have sufficiently low income), beneficiaries receive cash assistance to be used to purchase food.

11.     SNAP benefits are now delivered electronically through the use of a debit card type system called an Electronic Benefits Transfer (EBT) card, which replaced the former paper "food stamp" program where benefits were delivered via a paper coupon program.

12.     C.F.R. §274.2(a) mandates that ODJFS "*is responsible for the timely and accurate issuance of benefits to certified eligible households[.]*"

13.     Since moving to the electronic system, SNAP recipients have been repeatedly victimized by stolen benefits through a process known as "skimming."

---

[1] *See https://jfs.ohio.gov/static/ofam/Caseload%20Summary%20Report%20July%202023.pdf* (Last visited Feb. 2, 2024)

14.     Skimming is a technique thieves use to surreptitiously install a card-reading mechanism at a cash register or other point-of-sale (POS) device in a retail store to electronically capture a consumer's credit or debit card number, account information, and personal identification number (PIN).

15.     Once this data is stolen from the card, perpetrators use this information to create a counterfeit "dummy" card and then use this fraudulently cloned card to steal the cash benefits from an account before the victim has any opportunity to know that the theft has occurred.

16.     By "skimming" SNAP benefits from EBT cards, thieves have siphoned hundreds or, in some cases, thousands of dollars from persons' SNAP benefits, often leaving victims unable to feed their families.

17.     Indeed, often, victims are left with a significantly reduced or "0" balance after the theft.

18.     Plaintiff is one of the thousands, if not tens of thousands, of documented persons victimized by having their benefits recently stolen via "skimming" of SNAP benefits throughout the State of Ohio.

19.     These types of thefts, which are estimated to cost consumers $1 Billion annually, prompted the financial industry, starting in the 1990's, to update the technology utilized in card-based transactions, switching to cards with electronic "chips" and "tap-to-pay" cards by 2015 in the U.S., which are significantly more difficult to compromise.

20.     These technology updates by the financial industry have resulted in a reduction of skimming incidents overall but have left SNAP recipients increasingly vulnerable, as others have

adopted cards that are difficult to skim forcing thieves to search for easier targets like SNAP recipients because of Defendants' insistence on maintaining the use of antiquated technology.[2]

21.     As a result, SNAP participants are inherently susceptible to skimming because Defendants have failed to adopt a reasonable measure to thwart thieves—utilizing a technology (e.g. chip cards) which the vast majority of financial transactions adopted nearly a decade ago.

22.     In fact, Defendants are aware that SNAP recipients are often specifically targeted for theft by skimming and have been aware of the increasing risk of thefts to the types of EBT cards SNAP recipients are forced to use to receive their benefits.

23.     Meanwhile, SNAP recipients are forced to continue using an EBT card to purchase SNAP-authorized food products by swiping their cards through POS devices at grocery stores and other authorized vendors using a magnetic strip.

24.     At present, EBT cards can only be swiped using the card's magnetic strip and do not utilize an electronic "chip" or "tap-to-pay" technology that is now standard-issue for debit and credit cards because of the enhanced security features.

25.     Defendants do not dispute that Plaintiff and putative class members were the victims of this type of fraud and are in no way to blame for the thefts of their SNAP benefits.

26.     Nor do Defendants contest that they could have better protected the SNAP program and its participants from skimming, by adopting the industry standard chip or "tap-to-pay" cards in place of the obsolete and theft prone swipe cards.

27.     In fact, while Defendants continue to offer SNAP benefits via an antiquated EBT card, other programs administered by Defendants, such as the "WIC" benefit program for low income women and infant children, already utilize the newer "chip" technologies.

---

[2] *See https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/skimming* (Last visited Feb. 2, 2024)

28.     Nevertheless, even after SNAP recipients like Plaintiff report theft, Defendants have refused to replace the stolen benefits and, according to the State of Ohio, Defendants do not explicitly authorize states to replace stolen funds using federal funds unless the theft occurred after October 1, 2022.

29.     Defendants have based their refusal on 7 C.F.R. § 274.6, which authorizes States to replace benefits after a SNAP participant's card has been reported stolen or if food has been lost in a household misfortune, but does not expressly allow for reimbursement when benefits have been stolen via skimming.

30.     As a result, victims are often left with no ability to feed themselves or their families until issuance of the following month's benefits, and must instead desperately turn to other sources of emergency food sources from churches, food banks, relatives, and neighbors to make up the shortfall unless otherwise go hungry.

31.     However, the C.F.R. provides Defendants with no excuse for failing to replace benefits stolen through skimming. In adopting the current EBT system, Congress made clear that USDA-FNS must continue to provide program participants with replacement benefits on terms "similar" to those available to participants under the old "paper coupon" system, which permitted replacement of benefits—then distributed via paper coupons—stolen prior to receipt.

32.     Today, skimming occurs before participants ever even "receive" their benefits because, unlike paper coupons (which EBT cards replaced), benefits are not received until the participants use their EBT cards to purchase food and other goods at authorized retailers.

33.     Further, while Defendants allow replacement for participants who's physical EBT cards were stolen and whose benefits were subsequently drawn from their accounts, they have

denied relief to victims who were still in possession of their EBT cards but whose benefits have been surreptitiously stolen via skimming. This distinction defies any reason.

34.     By premising replacement on the mode of theft used to steal benefits, Defendants have acted arbitrarily, capriciously, and contrary to law.

35.     Accordingly, pursuant to the Administrative Procedure Act, Plaintiff, individually and as a class of all Ohio residents who lost their SNAP benefits as a result of skimming and who have not had the full value of their stolen benefits replaced, seek a declaration that Defendants' rules and policies are unlawful, and an injunction enjoining Defendants from refusing to replace (or refusing to allow Ohio to replace using federal funds) the full value of SNAP benefits stolen by skimming.

## **PARTIES, JURISDICTION, AND VENUE**

36.     Plaintiff Bennett is a natural person who lives in Columbus, Ohio.

37.     Defendant Tom Vilsack is the Secretary of the USDA, the agency responsible for regulating SNAP benefits through its Food and Nutrition Services ("FNS") Department. Defendant Vilsack is sued in his official capacity.

38.     Defendant Cindy Long is the Administrator of FNS, which is a sub-agency of USDA responsible for regulating SNAP benefits. Defendant Long is sued in her official capacity

39.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as this case arises under the Food and Nutrition Act, 7 U.S.C. § 2011 et seq. and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq.

40.     Venue is proper in this court pursuant to 28 U.S.C. § 1391 because the Southern District of Ohio is where the events giving rise to the Plaintiff's claims have occurred.

41.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure and by the Court's equitable authority.

## STATUTORY AND REGULATORY CONTEXT
### The History & General Overview of SNAP

42.     In 1964, Congress established the federally funded, State-administered Food Stamp Program. Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (codified as amended at 7 U.S.C. § 2011 et seq.). The program aims to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; 7 C.F.R. § 271.1 (2020).

43.     As of 2008, the Food Stamp Program has since been renamed the Supplemental Nutrition Assistance Program (SNAP), and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act"). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1651, 1853 (2008).

44.     Regulations promulgated by the USDA-FNS implement the SNAP Act and are applicable to all agencies administering SNAP programs. See 7 U.S.C. §§ 2013(c); 2020 (e)(6)(A).

45.     SNAP eligibility is restricted to low-income households. 7 U.S.C. § 2014(c); 7 C.F.R. § 273.9(a) (2017). In 2023, the net monthly income limit for SNAP eligibility is set at $1,133 for a single adult and $1,920 per month for a family of three.[3]

---

[3] *See* SNAP Eligibility, U.S. Dep't of Agric., https://www.fns.usda.gov/snap/recipient/eligibility (last visited Feb. 2, 2024).

46.     The maximum SNAP benefit is adjusted on an annual basis by USDA to account for cost-of-living increases. 7 C.F.R. § 273.9(a)(3) (2017).

47.     For the period from October 1, 2022, through September 30, 2023, the maximum benefit was $281 per month for one person and $740 per month for a family of three.[4]   As of November 2022, the average Ohioan received $273.00 in monthly benefits.[5]

48.     Federal law provides that SNAP participants are legally entitled to SNAP benefits provided they are eligible and apply for assistance. See 7 U.S.C. § 2014(a) ("*Assistance under this program **shall be furnished** to all eligible households who make application for such participation*.") (emphasis added).

49.     Although SNAP is a federally funded program, State agencies are responsible for administering the SNAP program within each State consistent with federal law. See 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4 (2020).

50.     In Ohio, the State Agency responsible for administering SNAP Benefits is the Ohio Department of Job and Family Services ("ODJFS"), as directed by Defendant State of Ohio.

51.     ODJFS issues SNAP program participants benefits once per month, usually on the same day every month.  SNAP participants then use these benefits to purchase food throughout the month, assuring perishable items remain fresh and food is not wasted.

52.     Federal law requires that State Agencies, like ODJFS, "provide timely, accurate, and fair service to applicants for, and participants in, the supplemental nutrition assistance program[.]" 7 U.S.C. § 2020(e)(2)(B)(i).

---

[4]  *See* Policy Memo, U.S. Dep't of Agric., SNAP-Fiscal Year 2023 Cost-of-Living-Adjustments (Aug. 9, 2022), https://www.fns.usda.gov/snap/fy-2023-cola (last visited Feb. 2, 2024)
[5] *See* https://jfs.ohio.gov/pams/Caseload-Summary-Report-November-2022.stm (Last visited Feb. 2, 2024)

53. During the COVID-19 pandemic, Section 1101 of the Families First Coronavirus Response Act (FFCRA), as amended by The Continuing Appropriations Act, 2021 and Other Extensions Act, authorized supplemental assistance for households with children who would have otherwise received free or reduced-price school meals under the Richard B. Russell National School Lunch Act in the form of Pandemic Electronic Benefits Transfer (P-EBT) benefits. FFCRA, Pub. L. 116–127.

54. P-EBT benefits operate within the same infrastructure as SNAP benefits and, according to Defendants, these P-EBT and SNAP benefits are indistinguishable for benefit issuance and redemption purposes.

**Pre-EBT Rules on Replacement and Liability for Stolen SNAP Benefits**

55. When the food stamp program first began, participants received their benefits in the form of paper coupons. These paper coupons were issued to participants using several methods. Some States mailed paper coupons directly to participants. H.R. Rep. No. 97-687, at 51 (1983). Others mailed "Authorization-to-Participate" documents to participants, who could take these documents to a post office, bank, or other authorized location to receive their paper coupons. *Id.*

56. In the late 1990s, Congress amended the SNAP Act to require State agencies to deliver SNAP benefits via an EBT system that complies with federally established standards. 7 U.S.C. § 2016(h); see also Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324 (1996). Under this system, participants are issued an EBT card to access their benefits instead of paper coupons.

57. Until 2010, USDA-FNS regulation 7 C.F.R. § 274.6 (since replaced) governed the replacement of stolen SNAP benefits. Under this regulation, and in recognition of Congress' aim to protect and improve service for program participants, State agencies were authorized to replace stolen coupons sent by mail if the theft occurred prior to the participants' "receipt" of the coupons.

10

If the coupons "were not received in the mail . . . [or] were stolen from the mail," then State agencies were authorized to replace the household's stolen benefits. 7 C.F.R. § 274.6(a)(1)(ii) (1989) (former regulation). However, if coupons were "lost, stolen or misplaced after receipt," then State agencies were not authorized to replace the coupons. Id. § 274.6(a)(2) (1989) (former regulation).

58.     In 1981, the Senate had proposed and passed the same "receipt" provision intending to combat fraud and trafficking in food stamps. See S. Rep. No. 97-128, at 63 (1981). The Senate intended to limit replacement benefits to coupons lost or stolen prior to receipt because, prior to the advent of the EBT system, the government had no way to track if paper coupons were being used fraudulently. Id. While the Senate-passed "receipt" provision was not passed into law, the USDA nevertheless adopted this provision in its regulations (subsequently codified at 7 C.F.R. § 274.6 (1989) (former regulation)) citing the same concerns identified by the Senate. See Replacement of Nondelivered, Stolen or Destroyed Food Stamp Authorizations and Food Coupons, 46 Fed. Reg. 50043, 50278 (Oct. 9, 1981). According to the USDA, the "[r]eplacement of coupons reported stolen after receipt is an area in which it is difficult to avoid some fraudulent reporting" because "[t]heft of coupons is difficult to verify." Id. At around this same time, the legislative history shows that Congress authorized the creation of the EBT system specifically to track the use of benefits and eliminate fraud and abuse in the system. See H.R. Rep. No. 97-106, at 258 (1981); see also H.R. Rep. No. 97-687, at 52 (1983).

59.     The former USDA-FNS regulation also authorized States to replace "Authorization-to-Participate" documents that were not received in the mail, stolen from the mail or after receipt, or defective, as well as coupons, authorization documents, and food purchased with coupons that were destroyed in a household misfortune. 7 C.F.R. §§ 274.6(a)(1)(i)–(iv)

(1989) (former regulation). The former regulation contained other rules regarding the replacement of benefits, including the requirement that the household experiencing the loss report it to the agency within 10 days, and limits on the number of replacement allotments in certain circumstances. 7 C.F.R. § 274.6(b) (1989) (former regulation).

60. 35. A separate regulation, 7 C.F.R. § 276.2 (1989) (former regulation), concerned State liability for the replacement of benefits. Under this regulation, States were strictly liable for coupon shortages and losses due to theft (among others) "except for those duplicate issuances in the correct amount that are the result of replacement issuances made in accordance with § 274.6" discussed above. 7 C.F.R. § 276.2 (1989) (former regulation).

61. Previously, the Electronic Fund Transfer Act (EFTA), enacted in 1978 and codified at 15 U.S.C. §§ 1693, et seq., protected all consumers against losses from unauthorized electronic transactions, including users of debit, credit, and EBT cards. That changed in 1996, when Congress amended the statute to remove the EBT systems that distribute needs-tested benefits, such as the SNAP EBT system, from its protections. See Pub. L. No. 104-193, § 907 110 Stat. 2105, 2350 (1996); 15 U.S.C. § 1693b(d). Instead, in its place, Congress amended the SNAP statute to ensure that EBT cardholders would be entitled to the same replacement of benefits rules previously enjoyed by coupon holders. See Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324 (1996). Codified at 7 U.S.C. § 2016(h)(7), the provision states:

> Regulations issued by the Secretary regarding the replacement of benefits and liability for replacement of benefits under an electronic benefit transfer system shall be similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system.

62. The replacement of benefits provision in effect when Congress issued this command was 7 C.F.R. § 274.6 (1989) (former regulation), which authorized replacement of paper coupons sent by mail if the theft occurred prior to the SNAP participants' "receipt" of the coupons.

63.     The SNAP Act, as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, § 825, 110 Stat. 2105, 2324 (1996), also directed the USDA and State agencies administering the SNAP program to "take into account evolving technology and comparable industry standards" regarding "privacy, ease of use and access to and service in retail food stores" following the switch from paper coupons to EBT. 7 U.S.C. § 2016(h)(2)(A), as amended by Pub. L. 101-624 § 1729, 104 Stat. 3359, 3789 (1990). Congress also commanded the agency to implement "other measures to protect against fraud and abuse." 7 U.S.C. § 2016(h)(2)(C)(i).

### USDA's Policy on Authorizing the "Replacement of Benefits" and "Liability for Replacement"

64.     Congress's intent in adopting 7 U.S.C. § 2016(h)(7) is clear: under the EBT system, as under the paper-based system, States are authorized to replace benefits stolen prior to "receipt," and the federal government is responsible for covering the cost.

65.     As legislative history shows, part of Congress' motivation in creating this EBT system was to benefit and protect participants in the program. Members of Congress and administration officials described the EBT system as being "more humane, claimed that the EBT system would allow "people to participate in purchasing their food with greater dignity," and said that it would "improve accountability and security while maintaining or improving service to recipients." Fraud in the Food Stamp Program: Hearing Before the Subcomm. on Domestic Mktg., Consumer Relations, and Nutrition of the Comm. on Agric., 97th Cong. 25 (1981); Formulation of the 1990 Farm Bill: Hearings Before the Subcomm. on Domestic Mktg., Consumer Relations, and Nutrition of the Comm. on Agric., 101st Cong. 14, 995 (1990).

66.     On April 12, 2010, the USDA promulgated a new set of regulations entitled "Supplemental Nutrition Assistance Program, Regulation Restructuring: Issuance Regulation

Update and Reorganization to Reflect the End of Coupon Issuance Systems." 75 Fed. Reg. 18,377 (Apr. 12, 2010). As stated in the adopting release, the "changes to the SNAP regulations are put forth to account for the replacement of the paper coupon issuance system with the Electronic Benefits Transfer (EBT) system as the nationwide method of distributing benefits to program recipients." *Id*.

67.     However, contrary to the clear mandate of the SNAP Act, USDA's new version of 7 C.F.R. § 274.6 was not remotely "similar" to the preceding version that governed paper coupons because it does not authorize replacement of benefits stolen or lost before the SNAP participants received these benefits. Instead, the new version of 7 C.F.R. § 274.6 limits States' ability to replace benefits where "the household reports that food purchased with [SNAP] benefits was destroyed in a household misfortune," 7 C.F.R. § 274.6(a)(1) (2013), or where the household informs the agency that their EBT card has been lost or stolen, 7 C.F.R. § 274.6(b)(2) (2013). No provision was made for replacing benefits stolen from SNAP participants before receipt through no fault of their own, even though Congress—and Defendants—were already well aware of the dangers of skimming at that time.

68.     Neither the proposed rule nor the adopting release explained why the USDA decided to further limit eligibility for replacement benefits, or why it eliminated participants' right to replacement benefits that were stolen prior to receipt. Nor did either contain any analysis of the costs to the federal government of providing such replacement benefits, or the cost savings the SNAP program would enjoy by eliminating participants' access to the benefits they are legally entitled to receive. The regulatory statement said only: "Throughout 7 CFR part 274, the Department is deleting language and several sections which directly address State agency responsibilities regarding issuance, replacement, storage, shipping, inventory management,

reconciliation, and reporting requirements for paper coupons." Supplemental Nutrition Assistance Program, Regulation Restructuring: Issuance Regulation Update and Reorganizations to Reflect the End of Coupon Issuance Systems, 75 Fed. Reg. 18,377 (Apr. 12, 2010). USDA did not offer any justification for replacing the old version of § 274.6 with the new, dissimilar version of the rule.

69.     Skimming was already a well-known and pervasive problem at the time § 274.6 was replaced. Skimming has existed since at least since 2002, when news outlets began reporting on tiny devices that could "record[] the names, account numbers and other identifying information from the magnetic stripes to be downloaded onto a personal computer later."[6] Indeed, according to ABC News, in 2009, the U.S. Secret Service estimated that annual losses from ATM skimming total about $1 billion each year.[7] By 2010, the technology available to skimmers had become far more advanced, and they began using "keypad overlays, which fit just on top of the original keypad and make note of which numbers are pushed for which transactions."[8]

70.     Over the past two decades, banks and card-issuers have introduced and now primarily utilize chip and "tap-to-pay" cards that make it significantly more difficult to skim consumers' debit and credit cards. By contrast, the USDA has never required chip or "tap-to-pay" cards for SNAP participants or taken efforts itself to protect program participants against electronic fraud.

---

[6] *See* Sue Chan, Is Your Credit Card Being Skimmed? CBS News (Dec. 6, 2002), https://www.cbsnews.com/news/is-your-credit-card-being-skimmed/ (last visited Feb. 2, 2024)

[7] *See* Ki Mae Heussner, ATM Skimming 101: How to Keep Safe, ABC News (Apr. 27, 2009), https://abcnews.go.com/Technology/Business/story?id=7434509&page=1. (last visited Feb. 2, 2024)

[8] *See* Ashley Feinberg, The Evolution of ATM Skimmers, Gizmodo (Aug. 27, 2014), https://gizmodo.com/the-terrifying-evolution-of-atm-skimmers-1626794130. (last visited Feb. 2, 2024)

71.     Rather, USDA has left it to the States to protect against fraud and abuse and take evolving technology and industry standards into account in administering what is a federal program. See, e.g., 7 C.F.R. § 274.1(a) (2016) (directing that "[s]tate agencies shall establish issuance and accountability systems which ensure that only certified eligible households receive benefits; that Program benefits are timely distributed in the correct amounts; and that benefit issuance and reconciliation activities are properly conducted and accurately reported to FNS"); 274.8(b) (2020) (providing that "the State agency shall ensure that the EBT system meets performance and technical standards in the areas of system processing speeds, system availability and reliability, system security, system ease-of-use, minimum card and terminal requirements, performance bonding, and a minimum transaction set").

## The 2023 Appropriations Act

72.     In December 2022, as part of the "Consolidated Appropriations Act, 2023" (the "2023 Appropriations Act"), Congress enacted provisions intended to prevent EBT benefit fraud. 2023 Appropriations Act, H.R. 2617, 117th Cong. § 501(b) (2023).

73.     Section 501(b) of the 2023 Appropriations Act directs the USDA to require States "to replace benefits that are determined by the State agency to have been stolen through card skimming, card cloning, or similar fraudulent methods." *Id.*

74.     But the Act limits the requirement to replace stolen benefits to only those stolen after October 1, 2022, and caps replacement to two months' worth of benefits and only two replacements per year. *Id.* § 501(b)(2).

75.     The 2023 Appropriations Act directed State agencies to submit a plan to the USDA within 60 days of the statute's enactment date.

16

76.    The statute also directed USDA to issue regulations directing States to adopt appropriate security measures to prevent card skimming, cloning and similar types of theft.

77.    The 2023 Appropriations Act left intact § 2016(h)(7) of the SNAP Act that requires that EBT cardholders be entitled to the same replacement of benefits rules enjoyed by coupon holders.

78.    The 2023 Appropriations Act takes some measures toward protecting SNAP participants from fraud and abuse, but falls far short of what is needed. Because many benefits were stolen prior to October 1, 2022, and because many lost more than two months' worth of benefits, they are not able to benefit from the Act's new provisions. And because skimming is rampant, Plaintiff will not be made whole for losses they are not responsible for and cannot control. The courts are the only recourse to recover the benefits which many depend on to survive.

**FACTUAL ALLEGATIONS**
**Use of EBT Cards to Purchase Food with SNAP in Ohio**

79.    SNAP program participants in Ohio use an EBT card to access SNAP benefits for the purchase of food from authorized retailers. The EBT benefits are "issued from and stored in a central databank" and the SNAP participants can receive the benefits only by "electronically access[ing them] . . . at the point of sale." 7 U.S.C. § 2016(h)(11).

80.    Behind the scenes, when a participant swipes their EBT card, account information stored on the magnetic stripe interfaces with a central database which enables the availability of funds to be verified, the participant's balance to be debited, and the appropriate amount to be credited to the retailer's bank account. The relevant state's EBT contractor is ultimately responsible for paying the retailer. Office of Mgmt. & Budget, Exec. Office of the President, OMB, 2 CFR Part 200, Appendix XI: Compliance Supplement, 179 (May 2023), https://www.whitehouse.gov/wp-content/uploads/2022/05/2022-Compliance-

Supplement_PDF_Rev_05.11.22.pdf. (last visited Feb. 28. 2023) The EBT contractor's "concentrator bank" makes the payment via the National Automated Clearing House (ACH) system and is reimbursed for the payments from the state's EBT benefit account with the United States Treasury. *Id.*

81.     SNAP program participants can check to see when benefits are credited to their account to use and the balance available in several ways: by (a) checking their local jobs and family services agency account online or through a mobile application; (b) calling the number on the back of their EBT card; or (c) checking the balance on their EBT card at an ATM. Participants' ability to know the balance of their SNAP benefits at any given time enables them to manage their budgets, and because SNAP participants are, by definition, lower-income individuals, their budgets are usually tight.

82.     Where a SNAP participant does not use the benefits within nine months of the date they were credited to their SNAP balance, the benefits are revoked.[9]

83.     In other words, the participant has access to a government administered SNAP account with a certain balance at any given moment available for use with a merchant, but the participant does not have physical control of the benefits themselves, as they once did when Food Stamp coupons were delivered to them in the mail. SNAP benefits cannot be withdrawn, downloaded, printed out, or deposited in the participant's personal bank account. Rather, the benefits must remain in the government-controlled account, where they are vulnerable to skimming and other forms of theft. Only when participants purchase food using their cards do they receive their benefits and the danger of electronic theft is eliminated.

---

[9] *See* AskUSDA; Do Supplemental Nutrition Assistance Program Benefits Expire?, U.S. Dep't of Agric. (Nov. 8, 2023) https://ask.usda.gov/s/article/Do-Supplemental-Nutrition-Assistance-Program-benefits-expire.
(last visited Feb. 2, 2024)

**Skimming of SNAP Benefits and the Response by Federal and State Agencies**

84.     Skimming occurs when perpetrators place a skimming device on an ATM or point-of-sale device. Skimming devices are extremely hard to detect—for both the customer and the owner/lessor of the ATM and point of sale device—and have become increasingly more sophisticated. Typically, these devices take the form of physical overlay devices with Bluetooth technology and are designed to look exactly like the underlying device. For example, in a retail store, thieves often install a false, Bluetooth-enabled cover designed to look exactly like a debit card reader over a real debit card reader. Because these devices look exactly like real debit card readers, they are very difficult for both customers and retailers to detect.

85.     Once perpetrators have gained access to the device, they are able to steal (skim) and then remotely transmit card/PIN information to an offsite location. Typically, perpetrators use the data to create a duplicate version of the card which then enables remote access to the compromised account.

86.     Since skimming devices simply transmit information and otherwise allow legitimate EBT transactions to proceed unimpeded, targeted retailers and victims are typically unaware that theft has occurred until their next attempted purchase or account balance review—after their account has already been compromised.

87.     Under ODJFS Policy, skimming victims are encouraged to do the following if they believe their benefits have been stolen:

> If you believe your benefits were stolen, change the EBT or cash PIN number right away. Then ask for a new EBT or cash card by calling 1-866-386-3071 for SNAP or 1-866-320-8822 for cash cards. Notify your local County Department of Job and Family Services and file a theft report with your local law enforcement agency. Contact information for your local JFS may be found at https://jfs.ohio.gov.

19

88.     Notably, chip cards used with chip readers are less vulnerable to skimming. However, to-date, defendant USDA FNS has not issued regulations or established standards regarding the use of chips in EBT cards, even though the use of chip cards has become industry-standard and would maximize security in compliance with statutory standards pertaining to USDA-FNS. *See* 7 U.S.C. § 2016(h)(2)(c)(i).

89.     Upon information and belief, there has been an increased incidence of skimming of EBT benefits.[10]; see also  https://www.whiznews.com/criminals-targeting-ohioans-ebt-cards/ (last visited Oct. 27, 2023); see also *Stark County warns about food assistance benefits being stolen from cards,* Canton Repository, Dec. 17, 2022 https://www.cantonrep.com/story/news/local/stark-county/2022/12/16/stark-county-job-family-services-reports-snap-fraud-ebt-cards-stolen/69735268007/ (last visited Feb. 2, 2024); see also, U.S. Dep't of Agric. (Oct. 19, 2022), https://www.fns.usda.gov/snap/scam-alerts (last visited Feb. 2, 2024); see also *Policy Memo from Cynthia Long,* Adm'r of Food & Nutrition Services, & Ann Flagg, Dir. of the Office of Family Assistance, SNAP and TANF Electronic Benefit Transfer (EBT) Card Skimming Prevention – Tools and Resources (Oct. 31, 2022), https://www.acf.hhs.gov/ofa/policy-guidance/snap-tanf-ebt-card-skimming-prevention. (last visited Feb. 2, 2024)

90.     On January 31, 2023, Defendants issued new policy guidance on skimming to States, as the 2023 Appropriations Act requires. Policy Memo from Tim English, Acting Assoc. Adm'r of Supplemental Nutrition Assistance Program, Replacement of SNAP Benefits in the Consolidated Appropriations Act of 2023 (Jan. 31, 2023).[11]

---

[10] *Id.*

[11] https://www.fns.usda.gov/snap/replacement-snap-benefits-consolidated-appropriations-act-2023 (last visited Feb. 2, 2024)

91. The guidance directed States to submit plans to Defendants to "address how state agencies will process household claims of stolen benefits" but this new guidance does not apply to Plaintiffs, whose benefits were stolen prior to October 1, 2022, or to losses exceeding more than two months' worth of benefits. Id. Nor does it change the regulation 7 C.F.R. § 274.6, which limits States' ability to replace benefits where "the household reports that food purchased with [SNAP] benefits was destroyed in a household misfortune," 7 C.F.R. § 274.6(a)(1) (2013), or where the household informs the agency that their EBT card has been lost or stolen, 7 C.F.R. § 274.6(b)(2) (2013).The limitations that Defendants impose on replacement of full value of stolen EBT benefits remain in force.

92. USDA-FNS's guidance is consistent with its unlawful regulation which does not authorize States to replace SNAP benefits stolen by skimming or accept liability for replacing benefits. The USDA-FNS policy is contrary to the command of Congress in 7 U.S.C. § 2016(h)(7) that it adopt regulations similar to those that pertained to the replacement of paper coupons. See 7 C.F.R. § 274.6 (1989) (former regulation).

93. Were Defendants' policy with respect to skimming "similar to" the pre-EBT form of 7 C.F.R. § 274.6, as required by 7 U.S.C. § 2016(h)(7), it would authorize States to replace SNAP benefits stolen by skimming because in such circumstances the benefits are stolen prior to the participants' receipt of such benefits. The States would not be liable for replacement of the skimmed benefits under such circumstances.

94. Skimmed SNAP benefits are stolen prior to the participant's receipt. Receipt occurs at the point in time that the participant successfully uses the EBT card to purchase food. Given that skimming deprives participants of the ability to complete a successful purchase by depleting the value of benefits left for the participants to use, benefits stolen by skimming – like paper coupons

21

stolen from the mail – are stolen prior to the participants' receipt of those benefits. Therefore, if the current version of 7 C.F.R. § 274.6 was indeed similar to the prior version, as Congress required, skimming would be an instance in which States are authorized to replace stolen benefits. The current regulation, however, does not authorize such replacement, and is therefore not "similar to" the prior version of 7 C.F.R. § 274.6 as required by 7 U.S.C. § 2016(h)(7).

95.     In failing to issue regulations authorizing the replacement of full value of the SNAP benefits stolen via skimming, and declining to authorize the replacement of those benefits, Defendants have acted contrary to law and arbitrarily and capriciously, thereby causing States to inappropriately deny replacement benefits to victims of skimming.

**Facts Relative to Plaintiff Bennett**

96.     Brina Bennett ("Bennett") is a 34-year-old single female who is a natural person who resides in Franklin County, Ohio and, at all times relevant to this action, was eligible for and receiving SNAP Benefits.

97.     Bennett has been receiving SNAP Benefits for approximately (5) years for herself and her two minor children, a five-year-old and an infant.

98.     Bennett, like others in the State of Ohio, receives her SNAP benefits from an EBT card provided to her by Defendant State of Ohio and ODJFS.

99.     On or about May 17, 2022, Bennett visited her local grocery store to purchase food for her family and, at checkout, her EBT card was denied.

100.     Bennett contacted the customer service number and realized at that moment and, for the first time, that she had a "zero balance" on her account meaning that she had never received her SNAP benefits.

101. Bennett immediately reported the missing benefits to ODJFS who sent a replacement card and instructed Bennett to "file a police report" which she did.

102. After personally investigating the issue, Bennett learned that someone in Texas had visited a local "Sam's Club" and spent funds attributed to Bennett's SNAP benefits account, thus depleting her funds before Bennett could utilize them.

103. Bennett was unable to pay for the food she sought to purchase that day and had lost $1,446.69 in SNAP benefits as a result of this apparent theft.

104. Notwithstanding taking all steps necessary to protect her benefits, as directed by ODJFS, ODJFS refused to replace the stolen funds claiming that ODJFS was "not authorized" to do so.

105. Bennett has never had this happen before or since and has never been compensated for the loss of her SNAP benefits through no fault of her own.

## CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of a class of similarly situated individuals (the "Class") defined as follows:

> All Ohio residents who since January 1, 2022, have been the victims of the skimming of SNAP benefits (including P-EBT benefits) or will be the victims of the skimming of such benefits and who have not had, or will not have had, their full value of their stolen benefits replaced by ODJFS, or the Federal Government.

107. Excluded from the Class are Defendants; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

108.    Plaintiffs reserve the right to modify and/or amend the Class and Ohio Subclass definition, including but not limited to creating subclasses, as necessary.

109.    *Numerosity*. The Classes are so numerous that joinder of all members is impracticable. Upon information and belief, thousands of households have been victims of EBT skimming in Ohio during the past year.

110.    *Commonality*. There are questions of fact and law common to the class, including but not limited to, whether defendant USDA-FNS's policy not to authorize States to replace benefits lost due to skimming violates 7 U.S.C. § 2016(h)(7), in violation of the APA.

111.    *Typicality*. The named Plaintiffs' claims are typical of the claims of the class in that each has been the victim of skimming and has been denied replacement benefits for the benefits stolen as a result.

112.    *Adequacy*. Plaintiffs and counsel will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel who are experienced in class actions and complex litigation, including litigation of this kind. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other members of the Class.

113.    *Predominance*. The questions of law and fact common to Class members predominate over any questions which may affect only individual members.

114.    *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go unremedied without

24

certification of the Class. Plaintiffs and Class members have been harmed by Defendants'

wrongful conduct and/or action. Litigating this action as a class action will reduce the possibility

of repetitious litigation relating to Defendants' conduct and/or inaction. Plaintiffs know of no

difficulties that would be encountered in this litigation that would preclude its maintenance as a

class action.

115.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3),

because the above common questions of law or fact predominate over any questions affecting

individual members of the Class, and a class action is superior to other available methods for the

fair and efficient adjudication of this controversy.

116.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2), because

Defendants have acted or refused to act on grounds that apply generally to the class so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

**FIRST CAUSE OF ACTION**
**Violations of APA § 706(2)**
***(On behalf of Plaintiffs and the Class)***
***(Against All Defendants)***

117.    Plaintiff repeats and realleges all of the preceding allegations with the same force

and effect as though fully set forth herein.

118.    The APA, 5 U.S.C. § 706(2), prohibits federal agency action that is, among other

things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law";

"contrary to constitutional right"; or "in excess of statutory jurisdiction, authority, or limitations,

or short of statutory right."

119.    USDA and FNS are each an "agency" under the APA. 5 U.S.C. § 551(1).

120.    By adopting policies and regulations that do not authorize States to reimburse

victims of skimming, Defendants are acting contrary to the statutory command of 7 U.S.C. §

2016(h)(7) which requires replacement of electronic SNAP benefits stolen prior to receipt as was required for paper coupons, and that the Defendants accept liability for the replacement of such skimmed benefits.

121.    Defendants have taken action "not in accordance with law," in violation of the APA.

122.    By adopting unexplained policies and regulations that do not authorize States to replace SNAP benefits stolen via skimming, in contravention of Congress' explicit direction, the agencies have acted arbitrarily and capriciously in violation of the APA.

123.    Defendants' violations have caused and will continue to cause ongoing harm to the individual Plaintiffs and the Plaintiff class.

**SECOND CAUSE OF ACTION**
**Violations of 42 U.S.C. § 1983**
***(On behalf of Plaintiffs and the Class)***
***(Against Defendant Damschroder)***

124.    Plaintiff repeats and realleges all of the preceding allegations with the same force and effect as though fully set forth herein.

125.    At all relevant times, Defendant Damschroder is included in the definition of a "person" as interpreted in 42 U.S.C. § 1983.

126.    At all relevant times, there was in effect 42 U.S.C. § 1983, which states in relevant part:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

127. The Fifth Amendment's states that "No person shall be…deprived of life, liberty, or property, without due process of law[.]"

128. At all relevant times, Defendant Damschroder had a duty and obligation to comply with the U.S. Constitution in its administration of SNAP benefits for eligible participants, including those SNAP eligible participants who had their EBT cards skimmed and their benefits stolen.

129. Defendant Damschroder's refusal to issue SNAP benefit cards with the updated chip technology, knowing the likelihood of theft, resulted in a widespread failure to provide eligible participants their SNAP benefits, depriving them of their property rights.

130. Additionally, Defendant Damschroder's refusal to provide replacement SNAP benefits for those who have had their benefits stolen via skimming without providing any meaningful opportunity for a fair hearing is a denial of Plaintiffs' due process rights.

131. As a result, Plaintiffs have been deprived of their right to adequate nutrition without justification and adequate nutrition is a fundamental right protected by the U.S. Constitution.

<u>**THIRD CAUSE OF ACTION**</u>
**Breach of Contract**
*(On behalf of Plaintiffs and the Class)*
*(Against Defendant State of Ohio)*

132. Plaintiff repeats and realleges all of the preceding allegations with the same force and effect as though fully set forth herein.

133. By issuing EBT cards, Defendant State of Ohio enters into a contractual relationship to provide SNAP benefits to eligible recipients.

134. By issuing flawed EBT cards without the standard chip technology that thwarts thieves, Defendant State of Ohio has made SNAP recipients more susceptible to theft and less

likely that SNAP beneficiaries will actually receive these monies to alleviate hunger.

135.     In addition, by failing to ensure Plaintiff and others similarly situated have actually received their SNAP benefits, Defendant State of Ohio has failed to perform its contractual obligation to deliver SNAP benefits to eligible recipients.

136.     Defendant State of Ohio's failure to perform, as agreed, has caused Plaintiff and Class Members damages in the form of lost SNAP funds and other harm resulting from Defendant State of Ohio's failure to perform, which entitles Plaintiff and Class Members to damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of the Classes, requests that the Court:

A.     Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiffs as the Class representative, and appoint the undersigned counsel as Class counsel;

B.     Issue a declaration that Defendants violated the APA by acting contrary to law and arbitrarily and capriciously;

C.     Issue an injunction enjoining Defendants from refusing to replace (or allowing the States to replace) SNAP benefits and P-EBT benefits stolen by skimming pursuant to 7 C.F.R. § 274.6;

D.     Issue an injunction commanding Defendants to authorize the replacement of stolen benefits for the individual Plaintiffs and the Plaintiff class, consistent with federal law;

E.     Award Plaintiffs their costs and attorneys' fees

F.     Award Plaintiffs and Class members pre- and post-judgment interest, to the extent allowable; and

G.     Award such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully Submitted,

*/s/ Brian D. Flick, Esq.*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Jeffrey A. Crossman (0073461)
Marita I. Ramirez (0101882)
DANNLAW
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com

*Attorneys for Plaintiffs and the Putative Class*

29